STATE of Wisconsin,
Plaintiff-Appellant,

v.

Jermichael James CARROLL,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2007AP1378–CR. Oral argument September 15, 2009.
—Decided February 3, 2010.*

2010 WI 8

(Also reported in 778 N.W.2d 1.)

For the defendant-respondent-petitioner there were briefs and oral argument by *Michael K. Gould,* assistant state public defender.

For the plaintiff-appellant the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals[1] that reversed an order by the Circuit Court for Milwaukee County, Judge Charles F. Kahn, Jr. presiding, in which the circuit court suppressed evidence obtained from the defendant's cell phone pursuant to a warrant. The circuit court based that order on the grounds that police, by searching the image gallery in the cell phone, illegally obtained the evidence that had formed the basis of that warrant in violation of the Fourth Amendment to the United States Constitution. The defendant, Jermichael James Carroll (Carroll), was charged with possession of a firearm by a felon. The court of appeals

---

[1] *State v. Carroll,* 2008 WI App 161, 314 Wis. 2d 690, 762 N.W.2d 404.

reversed the suppression order, ruling that untainted evidence that police later obtained provided a valid, independent basis for the warrant.

¶ 2. The focus of our inquiry is whether the evidentiary basis for the warrant to search the cell phone was tainted such that the Fourth Amendment to the United States Constitution, or Article I, Section 11 of the Wisconsin Constitution, requires suppression of that evidence under the following circumstances: (1) an officer who had observed Carroll speeding confronted Carroll outside of his vehicle and ordered him to drop an unknown object that he held in his hand; (2) upon retrieving that object, the officer recognized it as an open cell phone and observed on the display screen an image of Carroll smoking what appeared to be a marijuana blunt; (3) the officer kept the phone, scrolled through its image gallery, and saw other images depicting Carroll with illegal items; and (4) the officer answered an incoming call pretending to be Carroll, and during that conversation, the caller ordered illegal drugs. The police obtained a warrant to search the phone. With the warrant, the police obtained time-stamped digital images from Carroll's cell phone. It is that evidence that Carroll seeks to suppress.

¶ 3. We hold that neither the Fourth Amendment to the United States Constitution nor Article I, Section 11 of the Wisconsin Constitution requires that the evidence be suppressed under the circumstances presented here. In so holding, we are satisfied that the officer was justified in seizing Carroll's cell phone and in viewing the marijuana image, which was in plain view. Further, although the officer was also justified in continuing to possess the phone, we are satisfied that the officer was not justified in opening and browsing through the cell phone image gallery at the time that he

307

took such action. As such, the evidence that the officer gleaned from that conduct was tainted and could not form the basis for a search warrant. However, based on exigent circumstances, the officer was justified in answering the incoming call to Carroll's phone during which the caller ordered illegal drugs. That evidence was an untainted independent source that formed a valid basis for the search warrant when combined with the officer's knowledge of drug traffickers and Carroll's juvenile record, along with the plain view of the image of the marijuana blunt. Accordingly, we affirm the court of appeals.

## I. BACKGROUND

¶ 4. On December 6, 2006, Detective Belsha of the Milwaukee police department and his partner were conducting surveillance on a residence as part of an armed robbery investigation. They observed a white Ford Escort leave that residence, slow down as it passed their squad car, and speed away.

¶ 5. The officers attempted to catch the vehicle, which reached speeds of 60 miles per hour on residential streets with speed limits no higher than 25 miles per hour. According to Belsha's testimony at the suppression hearing, the driver, Carroll, eventually pulled the car to "an abrupt stop" in a gas station lot and quickly got out of the car while holding an object in his hands. The officers could not identify what Carroll was holding, so Belsha drew his weapon and ordered Carroll to drop the object and get on the ground, which Carroll did. The officers then handcuffed Carroll behind his back.

¶ 6. After handcuffing Carroll, Belsha retrieved the dropped object, which was a flip-style cell phone. The cell phone was lying open on the ground and

displayed an image of Carroll smoking a long, thin, brown cigarlike object ("the marijuana image"). Belsha, a member of the High Intensity Drug Trafficking Area Drug and Gang Task Force (HIDTA), testified that he recognized the object as a marijuana blunt.[2]

¶ 7. When the officers asked Carroll for identification, Carroll did not have any with him but gave the officers his name. The officers ran a "routine check" and learned that he was driving with a suspended license. Carroll also had a record of being adjudicated delinquent for a drug-related felony two years earlier as a juvenile.[3]

¶ 8. Belsha placed Carroll in the back seat of the squad car and sat in the front seat with the cell phone, where he activated the menus, opened the image gallery, scrolled through it, and saw images showing illegal drugs, firearms, and large amounts of U.S. currency. Specifically, Belsha testified that he saw an image of Carroll with what appeared to be a gallon-size bag of marijuana held in his teeth, and "several photos depicting firearms," including one showing Carroll holding a semiautomatic firearm ("the firearm image").

---

[2] The circuit court observed that when the phone was flipped open, the marijuana image appeared with a label above it reading "Big Boss Player"; that label eventually faded away, leaving only the marijuana image. Belsha did not testify to observing or reading the label.

[3] It appears, although it is not clear from the record, that the "routine check" did not reveal Carroll's juvenile record. In his Affidavit in Support of a Search Warrant, Belsha explained that after he had stopped Carroll, "[a] check of records with the Wisconsin Department of Transportation revealed that the driver[']s license of Carroll was suspended." Two paragraphs later in his affidavit, Belsha explained that "[a] review of Milwaukee County Circuit Court Juvenile Records reveals that [Carroll] was adjudicated delinquent of a felony offense, possession with intent to deliver cocaine[,] on March 15, 2004."

¶ 9. While Belsha continued to possess Carroll's cell phone, it rang several times and Belsha answered one of those calls, pretending to be Carroll. The caller asked for "four of those things; four and a split." Based on his training, Belsha recognized that the caller was attempting to purchase four and a half ounces of cocaine.

¶ 10. Two days later, on December 8, 2006, Belsha sought a search warrant for the cell phone. In his Affidavit in Support of a Search Warrant, Belsha mentioned the incriminating pictures he saw in the image gallery; specifically, he highlighted the firearm image as evidence that Carroll was in violation of the felon in possession of a firearm statute. Belsha also described the intercepted phone call. He further stated that drug traffickers commonly use cell phones to maintain contact with their sources and that the contents of Carroll's cell phone would provide evidence of those contacts as well as evidence related to several other offenses, including possession of cocaine with intent to deliver and possession of marijuana with intent to deliver. Moreover, Belsha explained that Carroll had been previously adjudicated delinquent for a felony, possession of cocaine with intent to deliver. In the affidavit, Belsha did not specifically describe or mention the marijuana image that he had observed when he first picked up the phone; however, he stated in the affidavit that, based on his knowledge and experience, drug traffickers commonly personalize their cell phones with images of themselves and "property acquired from the distribution of drugs."

¶ 11. A search warrant was issued by a court commissioner. After obtaining the warrant, the police downloaded the data on the cell phone, including the firearm image. Detective McQuown, who was trained in the handling of digital evidence, testified at a preliminary hearing that each image on the phone had attached

"metadata," which he described as information indicating the date and time at which the image was created. He also testified that the metadata is based on the date and time updates regularly provided through cell phone towers. According to testimony at the hearing, the metadata indicated that the firearm image had been created on May 22, 2006. Carroll was charged with possession of a firearm by a felon, Wis. Stat. § 941.29(2), based on photographic evidence downloaded from the cell phone, and the language in Wis. Stat. § 941.29(1)(bm), which relates to a person adjudicated delinquent for an act that, if committed by an adult, would be a felony.

¶ 12. Carroll moved to suppress the evidence obtained pursuant to the search warrant. Milwaukee County Circuit Judge Charles F. Kahn, Jr. granted that motion because Belsha's warrantless search of the image gallery could not be justified as a search incident to arrest. The circuit court found that Carroll was not under arrest at the relevant time. It further held that, even if police had arrested Carroll, that arrest would have been questionable given that Carroll had been speeding and driving with a suspended license, both noncriminal offenses. Accordingly, the court concluded that the evidence Belsha obtained from viewing the image gallery was tainted; that absent that evidence, there were insufficient grounds for the issuance of the warrant; and that the evidence obtained pursuant to the warrant had to be suppressed.[4]

---

[4] At the motion hearings, the State argued that Carroll was under arrest for speeding and for driving with a suspended license, and that Belsha's browsing through the cell phone image gallery was justified as a search incident to arrest. The State did not argue any other exceptions that would render the warrantless search constitutionally permissible. Neither party

311

¶ 13. The State appealed. The court of appeals, in a published decision written by Judge Joan F. Kessler, reversed the suppression order. Because the court of appeals held the issue related to untainted evidence was dispositive, it did not address whether a police officer may search a cell phone's image gallery as part of a search incident to arrest. However, in its conclusion, the court of appeals assumed that Belsha improperly scrolled through Carroll's cell phone image gallery without a warrant. It held, as a preliminary matter, that the information contained in the phone call that Belsha intercepted provided sufficient probable cause for a warrant. Given that premise, the court then assessed whether Belsha legally possessed the phone and, if so, whether it was proper for him to answer the incoming call. First, it concluded that Belsha had legal possession of the phone because, under the circumstances, Carroll was under arrest since "a reasonable person in Carroll's position would have considered himself to be 'in custody,' given the degree of restraint under the circumstances." *State v. Carroll,* 2008 WI App 161, ¶ 26, 314 Wis. 2d 690, 762 N.W.2d 404. The court of appeals then concluded that it was permissible for Belsha to answer the incoming call based on the exigency that potential evidence would be lost if he did not. It observed that even if it was unlawful for Belsha to scroll through the image gallery before obtaining the warrant, the evidence of the intercepted phone call where a person was attempting to purchase cocaine provided "independent probable cause" for issuing the warrant. *Id.,* ¶ 30. The court of appeals then held that because the warrant was lawfully acquired, the evidence obtained pursuant to that warrant was admissible. Accordingly, it reversed

presented testimony or arguments to the circuit court regarding the significance of Belsha's answering the incoming call.

the suppression order. Carroll then filed a petition for review, which this court granted.

## II. ISSUES PRESENTED
## AND STANDARD OF REVIEW

¶ 14. On appeal to this court, Carroll argues that the court of appeals erred in reversing the trial court's suppression order. He asserts that it was impermissible for Belsha to search his cell phone image gallery. In his view, the circuit court was correct in finding that the officers had not arrested him, and, therefore, Belsha's warrantless search could not be justified as a search incident to arrest. Moreover, Carroll contends that Belsha's answering the incoming call was also illegal, because he lacked probable cause to believe that in doing so he would obtain evidence of drug possession. Because the evidence from both the image gallery search and the intercepted phone call was tainted, Carroll argues, such evidence cannot support the issuance of a valid warrant.

¶ 15. The State contends that the phone call that Belsha intercepted, if untainted, provides evidence sufficient to establish probable cause for issuance of the warrant. It further argues that Belsha's continued possession of the phone and his answering the incoming call were permissible regardless of whether Carroll was in custody or not. Thus, it concludes, even assuming that Belsha's investigation of the image gallery produced tainted evidence, the intercepted phone call provided an untainted, independent source of evidence sufficient to justify the warrant being issued.[5]

---

[5] The State also puts forth an alternative argument that Belsha's browsing through the image gallery was legal because it occurred while Carroll was under lawful arrest. Because the

■

¶ 16. We agree with the State's approach as follows: First, we assess the legality under the Fourth Amendment of each warrantless search or seizure that produced the evidence outlined in Belsha's affidavit, namely: (1) Belsha's initial seizure of the cell phone; (2) Belsha's continued possession of the phone; (3) Belsha's browsing through the image gallery; and (4) Belsha's answering the incoming phone call. Second, based on that analysis, we determine whether the evidence obtained from those seizures and described in the affidavit is an independent source of untainted evidence justifying the issuance of the warrant.

■■

¶ 17. The question of whether a search comports with the Fourth Amendment is a question of constitutional fact. We uphold the circuit court's findings of evidentiary or historical facts unless those findings are clearly erroneous. We determine the application of constitutional principles to those evidentiary facts independently of the circuit court and the court of appeals, but we benefit from those courts' analyses. *State v. Sanders,* 2008 WI 85, ¶ 25, 311 Wis. 2d 257, 752 N.W.2d 713.

### III. DISCUSSION

#### A. Constitutional Permissibility of the Warrantless Searches

¶ 18. We begin by briefly revisiting general principles of Fourth Amendment law regarding the legality of warrantless seizures and searches. The Fourth

State's first argument that the intercepted phone call produced an untainted independent source is dispositive on the issues presented here, we need not reach the merits of that second argument.

314

Amendment to the United States Constitution, and Article I, Section 11 of the Wisconsin Constitution, protect "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; Wis. Const. art. I, § 11. The United States Supreme Court has viewed warrantless seizures of personal property such as containers to be per se unreasonable within the meaning of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 701 (1983).

¶ 19. Accordingly, the exclusionary rule requires courts to suppress evidence obtained through the exploitation of an illegal search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). This rule applies not only to primary evidence seized during an unlawful search, but also to derivative evidence acquired as a result of the illegal search, unless the State shows sufficient attenuation from the original illegality to dissipate that taint. *Murray v. United States*, 487 U.S. 533, 536–37 (1988).

¶ 20. Of course, the exclusionary rule is not absolute. The United States Supreme Court has identified particular circumstances when limited intrusions by law enforcement in a person's personal property pass muster under the Fourth Amendment. For example, law enforcement agents have limited authority to hold temporarily a container where they "have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant . . . if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Place,* 462 U.S. at 701.

315

¶ 21. Among the established exceptions to the warrant requirement that the United States Supreme Court in *Place* referenced, two are pertinent here. Exigent circumstances, such as when there is a danger that evidence will be destroyed or lost in the time it would take for law enforcement agents to obtain a warrant, may justify a warrantless search. *State v. Faust,* 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371. Additionally, under the "plain view" doctrine, an object falling within the plain view of an officer who rightfully is in a position to have that view is subject to valid seizure and may be introduced into evidence. *State v. Edgeberg,* 188 Wis. 2d 339, 345, 524 N.W.2d 911 (Ct. App. 1994) (citing *State v. Bell,* 62 Wis. 2d 534, 540, 215 N.W.2d 535 (1974)). In light of those principles, we examine each of the identifiable warrantless searches leading to the issuance of the search warrant in this case, namely: (1) Belsha's initial seizure of the cell phone; (2) Belsha's continued possession of the cell phone; (3) Belsha's browsing through the image gallery; and (4) Belsha's answering the incoming phone call.

### 1. Belsha's Initial Seizure of the Cell Phone

██

¶ 22. We are satisfied that Belsha's initial seizure of the cell phone did not violate Carroll's rights under the Fourth Amendment. Although there appears to be little Wisconsin case law regarding an officer's ability to demand that a suspect drop an object that the officer believes could be a weapon, such a command can be likened to a frisk or pat-down. *Cf. In the Matter of J.G.J.,* 388 A.2d 472, 475 (D.C. 1978) (concluding that an order to drop a weapon is tantamount to valid frisk). The

approach in Wisconsin for determining whether a pat-down is valid has been one of reasonableness. The court of appeals explained:

> A frisk or pat-down of a person being questioned during an investigatory stop is reasonable if the stop itself is reasonable and if the officer has reason to believe that the person might be armed and dangerous. This limited form of protective search . . . must be confined in scope to an intrusion reasonably designed to discover instruments which could be used to assault the officer.

*State v. Allen,* 226 Wis. 2d 66, 76, 593 N.W.2d 504 (Ct. App. 1999) (citations omitted).

¶ 23. Here, Carroll led officers on a high-speed chase in a car that the officers had been observing in connection with an armed robbery investigation, and exited his car quickly while holding an unknown object. Given that behavior, the officers would have been justified—based on the objective belief that Carroll could have been holding a weapon—in conducting a frisk or pat-down, which would have resulted in Belsha's legal possession of the cell phone. Hence, Belsha's order for Carroll to drop the object and his subsequent retrieval of it were reasonable actions, and accordingly, his initial seizure of the phone was justified.

¶ 24. After Belsha legally seized the open phone, his viewing of the marijuana image also was legitimate because that image was in plain view. Under Wisconsin case law, a warrantless seizure is justified under the plain view doctrine where the object is in plain view of an officer lawfully in a position to see it, the officer's discovery is inadvertent, and the seized object, either in itself or in context with facts known to the officer at the

317

time of the seizure, supplies probable cause to believe that the object is connected to or used for criminal activity. *Sanders,* 311 Wis. 2d 257, ¶ 37.

¶ 25. Here, Belsha was in legal possession of the phone and thus in a lawful position to view the display screen, which, according to Belsha's uncontroverted testimony, was open and displayed the marijuana image. Further, Belsha testified that based on his experience working in the HIDTA, he recognized the object Carroll was smoking in the image as a marijuana blunt. That, taken in context with other facts known to Belsha at the time, namely, that individuals involved in drug trafficking often personalize their phones with such images, provided sufficient probable cause to believe that the phone was an instrument of criminal activity and contained evidence linked to that activity. Under the circumstances, Belsha had probable cause to seize the cell phone.

2. Belsha's Continued Possession of the Cell Phone

¶ 26. After Belsha seized the phone with the marijuana image displayed, he continued to maintain possession of the phone after he had placed Carroll in the squad car. We conclude that that continued possession was justified, again following the United States Supreme Court's reasoning in *Place.* The Court in *Place* addressed the ability of law enforcement agents to seize and detain a person's luggage based on reasonable suspicion that the luggage contained narcotics and under circumstances where that owner was not in custody or under arrest. The Court went on to hold that the agents had narrow authority to detain temporarily a container in such circumstances though the agents in that case exceeded their authority to do so. However, in reaching its conclusion, the Court explained,

> Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.

*Place,* 462 U.S. at 701. In other words, law enforcement agents are justified in seizing and continuing to hold a container if (1) there is probable cause to believe that it contains evidence of a crime, and (2) if exigencies of the circumstances demand it.

¶ 27. As an initial matter, although the "containers" discussed in *Place* were pieces of luggage, it is reasonable to analogize the cell phone in this case to the luggage in *Place.* The underlying concern with the agents' detention of the luggage in *Place* was that Place had a reasonable expectation of privacy in the contents of his bags. So, too, here, the concern is protecting a person's reasonable expectation of privacy in the contents of his or her cell phone. Other courts, in assessing the validity of a search without a warrant, have likened a person's privacy expectations in cell phones and electronic devices to that of closed containers in his or her possession. *See, e.g., United States v. Finley,* 477 F.3d 250, 259–60 (5th Cir. 2007) (holding that the defendant had a sufficient privacy interest in his cell phone call records to challenge the search therein); *United States v. Ortiz,* 84 F.3d 977, 984 (7th Cir. 1996) (holding that the owner of a pager has the same reasonable expectation of privacy in its data as if it were a closed container); *United States v. Wurie,* 612 F. Supp. 2d 104, 109 (D. Mass. 2009) ("It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone."). Accordingly, in this

319

situation, the analogy to a closed container appears to be appropriate.[6]

¶ 28. As to the question of whether Belsha had probable cause to believe that the phone contained evidence of illegal drug activity, Carroll argues that, having viewed the marijuana image, Belsha had probable cause only to believe that Carroll had possessed illegal drugs, not to believe that he was a trafficker or that the phone contained evidence of trafficking. We disagree. To establish probable cause to search, the evidence must indicate a "fair probability" that the particular place contains evidence of a crime. *State v. Hughes,* 2000 WI 24, ¶ 21, 233 Wis. 2d 280, 607 N.W.2d 621 (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). An officer's knowledge, training, and experience are germane to the court's assessment of probable cause. *Wurie,* 612 F. Supp. 2d at 108. *Cf. United States v. Arvizu,* 534 U.S. 266, 270–71 (2002) (considering an officer's subjective interpretation of facts as part of the totality of circumstances in assessing reasonable suspicion, a determination that is closely akin to a probable cause assessment).

¶ 29. Here, Belsha legally viewed the marijuana image; we consider that fact along with his testimony that he knew, based on his training and experience, that drug traffickers frequently personalize their cell phones with images of themselves with items acquired through drug activity. Furthermore, it is those personalized cell phones on which drug traffickers commonly make many of their transactions. Carroll did not introduce evidence

---

[6] We note, however, that that analogy is limited to circumstances like those presented here and should not be taken as a general holding that cell phones are to be treated as closed containers in all search contexts, such as, for example, a search incident to arrest or an inventory search.

suggesting that Belsha's testimony in that regard was inaccurate or not credible, and we see no reason to discount it. We are satisfied, under all of the circumstances here, that that information, taken as a whole, gave Belsha probable cause to believe that the phone contained evidence of illegal drug activity.

¶ 30. Two additional points are worth noting. First, to clarify, our assessment goes to the totality of the circumstances that, *taken as a whole* give rise to probable cause. We recognize that cell phones can be common tools used not only in illegal activities but also in legal activities. Here, Belsha's testimony, taken in context with the plain view of the marijuana image and how it appeared on the phone, provides sufficient evidence of probable cause.

¶ 31. Second, the State argues that the fact that Belsha observed Carroll leaving a location that police suspected to contain evidence of an armed robbery also adds significant weight supporting probable cause in this situation. We note that the record here does not clearly establish a nexus between the crimes of armed robbery and drug trafficking.

¶ 32. Given that Belsha had probable cause to believe that a search of the phone would produce evidence of illegal drug activity, his continued possession of the phone while he sought a warrant was permissible. The same reasons that permitted Belsha to seize the phone in the first instance permitted him to continue to possess it in the short time after Carroll was secured. Exigent circumstances further justify that continued possession. Had Belsha returned the phone to Carroll and released him, Carroll could have deleted incriminating images and data, such as phone numbers and calling records stored in the phone. Hence, Belsha's continued possession of the phone was permissible.

### 3. Belsha's Browsing Through the Image Gallery and Answering the Incoming Call

¶ 33. Next, two things happened as Belsha continued to possess the phone legally. First, he opened and browsed through the cell phone's image gallery. Second, he answered an incoming call. As an initial matter, the image gallery search clearly seems to be contrary to the holding in *Place* because there were no exigent circumstances at the time requiring him to review the gallery or other data stored in the phone. That data was not in immediate danger of disappearing before Belsha could obtain a warrant. Moreover, the United States Supreme Court in *Place* invoked *Arkansas v. Sanders,* 442 U.S. 753 (1979), as support for its rule. *Place,* 462 U.S. at 701 & n.3. In *Sanders,* officers with probable cause to believe a suitcase contained contraband were justified in seizing that suitcase, but the Fourth Amendment precluded their immediate search of the case without a warrant. 442 U.S. at 761, 766. Again, we note that the court of appeals assumed that Belsha's browsing through the image gallery on Carroll's phone without a warrant was improper. We need not make the same assumption. Rather, we are satisfied that that search was indeed improper and that the evidence obtained from that search at that time was tainted. In so holding, we are adhering to the holding of the United States Supreme Court in *Place,* 462 U.S. at 701, and in *Sanders,* 442 U.S. at 761, 766.

¶ 34. However, Belsha's answering the incoming call was justified. We again apply the standard from *Place,* which requires that the officer had probable cause to believe that the device contains evidence of a

crime and that exigent circumstances justify a warrant-less search. 462 U.S. at 701. Here, as explained above, Belsha had probable cause to believe that the cell phone was a tool used in drug trafficking based on the plain view of the marijuana image and his knowledge that such images are typically found on drug traffickers' phones. That evidence shows more than a fair probability that an incoming call to such a phone would contain evidence of illegal drug activity. In short, the probable cause requirement in *Place* is satisfied here.

▬▬ ▬▬

¶ 35. Moreover, exigent circumstances permitted Belsha's answering the call. The test for whether exigent circumstances are present focuses on whether the officer reasonably believes that the delay necessary to obtain a warrant, under the circumstances, threatens the destruction of evidence. *Faust,* 274 Wis. 2d 183, ¶ 11. We are not aware of any Wisconsin case that expressly addresses whether an officer's interception of an incoming call on a seized cell phone is an exigent circumstance. However, several federal cases address whether an officer may, based on exigent circumstances, access data or answer incoming calls on an electronic device that the officer had legally seized.[7] Those cases, which we explore in detail herein, provide persuasive guidance.

---

[7] In those federal cases, the agents had legal possession of the electronic devices pursuant to a search incident to arrest. We acknowledge that here, we are not basing our holding on whether there was a search incident to arrest. However, those cases nonetheless provide persuasive guidance because the fact of the valid arrest was relevant only to whether the agent legally possessed the electronic device in question. As to the question of whether an agent in legal possession of a device could access data contained within it, those courts assessed whether exigent circumstances—not the fact of the arrest—justified that aspect of the search.

¶ 36. In the foundational case, *United States v. Ortiz,* officers seized an electronic pager incident to Ortiz's arrest for distribution of heroin. 84 F.3d at 982. While continuing to search Ortiz and his vehicle for evidence, one of the agents pushed a button on the pager that revealed the numeric codes that the pager previously had received. The district court denied Ortiz's motion to suppress that evidence. The Seventh Circuit Court of Appeals affirmed that denial based on the risk that the data would be destroyed or lost if agents were required to first obtain a warrant:

> Because of the finite nature of a pager's electronic memory, incoming pages may destroy currently stored telephone numbers in a pager's memory. . . . Thus, it is imperative that law enforcement officers have the authority to immediately "search" or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence.

*Ortiz,* 84 F.3d at 984.

¶ 37. In subsequent cases, other courts have adopted that rationale when evaluating an officer's ability to search a seized cell phone incident to arrest, and have permitted law enforcement to conduct a warrantless search of a phone's stored data, such as records of calls received and made, so long as the other requirements of the search incident to arrest exception were satisfied. *See, e.g., Finley,* 477 F.3d at 259–60 (holding that a search of a cell phone's stored text messages and call records was permissible); *Wurie,* 612 F. Supp. 2d at 110 (holding that a search of a cell phone was permissible); *United States v. Deans,* 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008) (holding that officers may search any data contained in a cell phone lawfully seized).

¶ 38. To be sure, cell phones and pagers are not interchangeable. Indeed, the court in *United States v. Wall,* 2008 WL 5381412, *4 (S.D. Fla. 2008), observed that while exigent circumstances could justify a warrantless search of a cell phone,

> [t]he differences in technology between pagers and cell phones cut to the heart of this issue [of whether an officer's reading of stored text messages within a cell phone was justified based on exigent circumstances]. The technological developments that have occurred in the last decade, since *Ortiz* was decided, are significant. Previously, there was legitimate concern that by waiting minutes or even seconds to check the numbers stored inside a pager an officer ran the risk that another page may come in and destroy the oldest number being stored. This was based on a platform of first-in-first-out storage of numbers used for pagers. Text messages on cell phones are not stored in the same manner. . . . [I]f a text message is not deleted by the user, the phone will store it.

¶ 39. In *Wall,* the court concluded that the government failed to demonstrate an exigency justifying the agent's search of the defendant's text messages. There, the government put forth no evidence of the danger of the text messages being destroyed; to the contrary, it acknowledged that such messages generally remain stored in the phone unless a user actively deletes them. Given that, the court concluded that the officers' review of the text messages was purely investigatory and evidence obtained from that review was therefore tainted.

¶ 40. Significantly, at least one court has concluded that when a government agent lawfully possesses a phone and there is probable cause to believe it

is used in illegal drug activity, the agent can answer incoming calls if the calls arrive in a period when it is impracticable for the agent to obtain a warrant first. *See United States v. De La Paz,* 43 F. Supp. 2d 370, 375 (S.D.N.Y. 1999). In *De La Paz,* agents had lawfully seized a cell phone incident to an arrest. While the agents were processing the defendant's arrest, the defendant's phone rang nine times and the agents answered it each time. The defendant unsuccessfully sought to have evidence of those phone calls suppressed. The court concluded that it was reasonable under the circumstances for the agents to answer the cell phone of a suspected drug dealer in the time between the arrest and arraignment, given both the impossibility of timely obtaining a warrant allowing agents to answer incoming calls and the risk of losing evidence by leaving those calls unanswered. As the *De La Paz* court observed, in those circumstances, "the Fourth Amendment does not require . . . agents to ignore potential evidence that might disappear." *Id.* at 375–76.

¶ 41. The consistent approach taken in these cases is that the courts scrutinized the nature of the evidence obtained, i.e., numeric codes on a pager, stored text messages, and incoming phone calls, and balanced that with an inquiry into whether the agent reasonably believed that the situation required a search to avoid lost evidence. Based on that assessment, it appears that the courts then reserved the exigent circumstances exception for searches directed at the type of evidence that is truly in danger of being lost or destroyed if not immediately seized. That approach is consistent with Wisconsin case law addressing exigent circumstances. *See Faust,* 274 Wis. 2d 183, ¶ 12 (stating that the rule

for determining whether exigent circumstances are present requires an inquiry into whether the officer reasonably believed that the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence).

¶ 42. Hence, we are satisfied that exigent circumstances justified Belsha's answering Carroll's cell phone. The fleeting nature of a phone call is apparent; if it is not picked up, the opportunity to gather evidence is likely to be lost, as there is no guarantee—or likelihood—that the caller would leave a voice mail or otherwise preserve the evidence. Given these narrow circumstances, Belsha had a reasonable belief that he was in danger of losing potential evidence if he ignored the call. Thus, the evidence obtained as a result of answering that phone call was untainted.

### B. Independent Source Doctrine

¶ 43. Having determined that the warrantless seizure and subsequent viewing of the image gallery on Carroll's phone produced tainted evidence, we turn our attention to the question of whether the resulting warrant is nonetheless valid. We conclude, for the reasons set forth below, that the phone call Belsha answered is an untainted independent source of evidence to support the search warrant, that the untainted evidence, which is combined, as noted previously, with the officer's knowledge of drug traffickers and Carroll's juvenile record, provides sufficient probable cause to issue the warrant, and that as a result, the warrant is valid.

¶ 44. The independent source doctrine derives from the principle that " '[w]hen the challenged evi-

327

dence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' " *Murray,* 487 U.S. at 537 (quoting *Nix v. Williams,* 467 U.S. 431, 443 (1984)). As applied to circumstances where an application for a warrant contains both tainted and untainted evidence, the issued warrant is valid if the untainted evidence is sufficient to support a finding of probable cause to issue the warrant. *See id.* at 542; *State v. O'Brien,* 70 Wis. 2d 414, 424, 234 N.W.2d 362 (1975). Indeed, "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." *Murray,* 487 U.S. at 542. Thus, our next task is to determine whether the untainted evidence—i.e., evidence Belsha obtained from the incoming phone call—is "genuinely independent" of the earlier tainted evidence—here, Belsha's viewing of the image gallery.

¶ 45. For courts determining whether untainted evidence provides an independent source, the United States Supreme Court in *Murray* set forth a standard requiring the state to bear the burden of "convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." 487 U.S. at 540. The court of appeals has articulated the test to be a two-pronged approach: First, the court determines whether, absent the illegal entry, the officer would have sought the search warrant. Second, it asks if information illegally acquired influenced the magistrate's decision to authorize the warrant. *State v. Lange,* 158 Wis. 2d 609, 626, 463 N.W.2d 390 (Ct. App. 1990).

¶ 46. Moreover, the court of appeals in *State v. Herrmann,* 2000 WI App 38, 233 Wis. 2d 135, 608 N.W.2d 406, applied the independent source doctrine in a similar situation involving a search warrant based on both tainted and untainted evidence. Although the court in *Herrmann* did not invoke *Murray* or *Lange* in its analysis, we are satisfied that the analysis in *Herrmann* is consistent with the principles set forth in those cases.

¶ 47. In *Herrmann,* officers were executing a valid search warrant on an apartment in a multi-unit building when they found a door leading to a storage room of a separate apartment although that fact was not immediately apparent. The officers discovered marijuana plants in the storage room's closet before moving on to other rooms. They then realized that they were in a second apartment not covered by the warrant, but they nevertheless improperly obtained other evidence of illegal drug activity that they used, along with the evidence of the plants in the storage room closet, to apply for a warrant to search the second apartment. *Id.,* ¶ 7.

¶ 48. The court of appeals concluded that the untainted evidence of the plants in the storage room closet was a source independent from the tainted evidence police later acquired. It further concluded that the discovery of the plants in the storage room closet alone was sufficient to establish probable cause that the apartment contained other related contraband. *Id.,* ¶ 23. Thus, it upheld the search warrant and reversed the circuit court's order suppressing the evidence obtained pursuant to the warrant.

¶ 49. With that case in mind, we apply the circumstances here to the first inquiry set forth in *Murray:* whether information obtained from the illegal

329

search affected the law enforcement officers' decision to seek a warrant. Like the evidence obtained from the storage ·closet in *Herrmann,* the untainted evidence from the incoming phone call here was genuinely independent of the tainted viewing of the image gallery. As explained above, Belsha's answering the incoming call was justified: He legally possessed the phone, he had viewed the marijuana image that was in plain view, his training and experience informed him that drug traffickers typically employ such phones in their illegal activities, and, based on those circumstances, he was not required to ignore the incoming call and risk losing evidence of illegal activity. The caller then provided Belsha with evidence that Carroll was a drug dealer by placing an order. In short, Belsha did not need the tainted evidence he had obtained from the image gallery to justify answering the call or applying for a search warrant. Just as the officers' missteps in *Herrmann* did not operate to place them in a worse position after having legally discovered the marijuana plants in the storage room closet, Belsha's improper viewing of the image gallery should not operate to penalize the police where they legally obtained the evidence from the phone call. That conclusion is wholly consistent with the independent source doctrine's foundational policy "that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it otherwise would have occupied." *Murray,* 487 U.S. at 542.

¶ 50. It is worth noting that in *Lange,* the court of appeals remanded based on the first prong of the test, for an explicit finding as to whether the law enforcement agents would have sought the warrant absent the tainted evidence. *Lange,* 158 Wis. 2d at 627–28; *see also Murray,* 487 U.S. at 543. We acknowledge that here, the

circuit court did not make the explicit findings that the court of appeals had asked the circuit court to consider making on remand in *Lange*. However, we are satisfied that the circuit court's failure to do so in this case does not require remand. In *Murray*, 487 U.S. at 543, the United States Supreme Court indicated that, absent an explicit finding, a clear inference could compel the conclusion that law enforcement agents would have sought a warrant had they not obtained tainted evidence.

¶ 51. We are satisfied, based on our analysis above, that the circumstances here permit such an inference to be drawn from which we can conclude that Belsha, despite the improper viewing of the image gallery, would have sought the warrant. First, we can reasonably infer that Belsha would have sought the warrant based on his plain view of the marijuana image, combined with his knowledge acquired from his training and experience that drug traffickers commonly use such images to personalize their cell phones. Second, we can reasonably infer that Belsha would have sought the warrant based on the information that he intercepted when he answered the phone call, coupled with his knowledge of Carroll's juvenile record. In short, these circumstances compel us to conclude that a clear inference can reasonably be determined to exist here that Belsha would have sought the warrant even if he had not browsed through the image gallery.[8]

---

[8] We respectfully disagree with the dissent's argument that neither *Murray* nor the record supports this inference. In our view, the facts here support the clear inference that *Murray* demands, and that clear inference is consistent with that case's language and underlying rationale. *See Murray*, 487 U.S. at 542 (observing tension between forbidding law enforcement from

331

¶ 52. We also conclude that the second part of the *Murray* analysis, that the illegal evidence did not affect the magistrate's decision to grant the warrant, is satisfied inasmuch as the untainted evidence provides sufficient probable cause to issue a warrant. In reviewing whether probable cause supports the issuance of the search warrant, the reviewing court applies a totality of the circumstances standard and asks whether the facts set forth in the affidavit establish sufficient probable cause to believe that police are likely to find items related to the commission of a crime in the place designated to be searched. *State v. Kerr*, 181 Wis. 2d 372, 378, 511 N.W.2d 586 (1994) (citing *Gates*, 462 U.S. at 238–39). In the context of a search warrant, "probable cause is not a technical or legalistic concept, but rather, is a flexible, common-sense measure of the plausibility of particular conclusions about human behavior." *Id.* at 379.

¶ 53. Here, Belsha included the following information in his affidavit: (1) drug traffickers frequently use cell phones to communicate and facilitate most of their illegal activities; (2) drug traffickers often personalize their phones with images of themselves with drugs and paraphernalia; (3) Carroll had been adjudicated delinquent as a juvenile for a felony, possession with intent to deliver cocaine; (4) the cell phone gallery contained images of Carroll with a firearm; (5) Belsha pretended to be Carroll when he answered an incoming call, during which the caller ordered drugs; and (6) Belsha saw photos of Carroll holding a semiautomatic gun, along with photos of Carroll "with what appears to be a quantity of marijuana, photos of what appears to be

---

benefitting from illegal behavior and not placing it in a worse position than it otherwise would have occupied).

cocaine, as well as photos of drugs, money, and a revolver."

¶ 54. As stated above, we are satisfied that the evidence that Belsha viewed while scrolling through the image gallery was tainted and cannot form the basis for the warrant. Thus, of the above facts in the affidavit, the following are proper considerations in assessing whether to authorize the warrant: the first and second, setting forth Belsha's knowledge of the typical ways in which drug dealers personalize and use their cell phones, such as displaying an image like the marijuana image that Belsha saw in plain view;[9] the third, explaining that Carroll had been adjudicated delinquent for a felony, possession of cocaine with intent to deliver; and the fifth, detailing the incoming phone call and the order for drugs.

¶ 55. We conclude that that evidence, like the untainted storage closet evidence observed in *Herrmann,* is sufficient to find probable cause to authorize the warrant. The incoming call was an untainted source of evidence independent of the tainted evidence obtained from browsing through the cell phone image gallery. Based on the information provided in that incoming call, taken in context with the other untainted evidence that in Belsha's experience Carroll's phone bore the indicia of a drug trafficker, there was probable cause to believe that the phone would contain evidence pertaining to the illegal drug trade. *Accord O'Brien,* 70 Wis. 2d at 424–25 (concluding that mention of tainted evidence in an affidavit "added nothing that was required for the issuance of the search warrant"). Hence, the warrant was

---

[9] Belsha did not specifically mention the marijuana image that he saw in plain view in the warrant affidavit. However, that fact speaks to Belsha's understanding of drug trafficker practices and how that understanding informed his actions.

valid; as a result, the evidence obtained pursuant to that warrant, including the firearm image and its accompanying metadata indicating when it was taken, is admissible, and that evidence should not have been suppressed by the circuit court. The court of appeals did not err in concluding as much.

## VI. CONCLUSION

¶ 56. We hold that neither the Fourth Amendment to the United States Constitution, nor Article I, Section 11 of the Wisconsin Constitution, requires that the evidence be suppressed under the circumstances presented here. In so holding, we are satisfied that the officer was justified in seizing Carroll's cell phone and in viewing the marijuana image, which was in plain view. Further, although the officer was also justified in continuing to possess the phone, we are satisfied that the officer was not justified in opening and browsing through the cell phone image gallery at the time that he took such action. As such, the evidence that the officer gleaned from that conduct was tainted and could not form the basis for a search warrant. However, based on exigent circumstances, the officer was justified in answering the incoming call to Carroll's phone, during which the caller ordered illegal drugs. That evidence was an untainted independent source that formed a valid basis for the search warrant, when combined with the officer's knowledge of drug traffickers and Carroll's juvenile record, along with the plain view of the image of the marijuana blunt. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 57. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with much of the majority's analysis but I

334

believe the law requires that the cause be remanded to the circuit court for a factual determination of (1) whether any information gained from the phone call or the illegal search of the image gallery affected the law enforcement officers' decision to seek a warrant; and (2) whether any information gained from the phone call or the illegal search of the image gallery affected the magistrate's decision to grant the application.

¶ 58. I agree with the majority opinion that both Carroll and his phone were lawfully seized by Detective Belsha. Majority op., ¶ 22.

¶ 59. I agree with the majority opinion that Detective Belsha's viewing of the "marijuana image" was lawful because the image was in "plain view." Majority op., ¶¶ 3, 24.

¶ 60. I agree with the majority opinion that the Detective's browsing through the cell phone "image gallery" violated the Fourth Amendment. Majority op., ¶¶ 3, 33.

¶ 61. Even if I agreed with the majority both that the "marijuana image" provided probable cause to apply for a warrant to search the contents of the cell phone[1]

---

[1] There are significant problems with the majority opinion's evaluation of probable cause on this basis.

Detective Belsha did not even mention the "marijuana image" in his application for a search warrant. This "marijuana image" showed only Carroll smoking a "blunt," an ordinary cigar hollowed out and filled with marijuana. If his training and experience had led him to conclude that the marijuana image by itself gave probable cause to believe that Carroll was involved in drug trafficking and that the cellular phone was an instrument of the drug trade, then his failure to mention this photo in the warrant affidavit is inexplicable. He also ignored several incoming calls while browsing the image gallery.

and that exigent circumstances[2] existed that justified the Detective's answering the cell phone (without a warrant)[3] to get information about drug

These facts cannot be reconciled with the theory that the Detective's "training and experience" by themselves supported an inference drawn from the "marijuana photo" that the phone itself, or any incoming call, would contain evidence of drug trafficking. Rather, the obvious implication is that the Detective thought the initial photo relatively inconsequential, and the decision to answer the later call was motivated by the photos he had already viewed in the image gallery.

[2] "Exigent circumstances" refers "in legal jargon, because our profession disdains plain speech," *United States v. Collins,* 510 F.3d 697 (7th Cir. 2007), simply to one of several well-established categories of emergency situations in which it would be impracticable for police to obtain a warrant, and so none is required. *See, e.g., State v. Richter,* 2000 WI 58, ¶ 29, 235 Wis. 2d 524, 612 N.W.2d 29 ("There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home."). Here the espoused "exigency" is the possible loss of evidence. Majority op., ¶ 21.

Notably, Detective Belsha himself never espoused an "exigent circumstances" rationale for answering the call. Rather, he believed that he was proceeding pursuant to a valid search "incident to arrest," a conclusion that the circuit court and the majority opinion now set aside.

[3] The theory of the majority's "exigent circumstances" rationale—that if the call went unanswered, important evidence would be lost—is at odds with the Detective's decision to ignore previous incoming calls, all equally likely to contain incriminating evidence. *See* majority op., ¶ 40 (discussing *United States v. De La Paz,* 43 F. Supp. 2d 370, 375 (S.D.N.Y. 1999) (exigent circumstances rationale justified where agents answered every one of nine incoming calls)). The far more likely explanation, which it is the State's burden to disprove, is that Detective Belsha did not have sufficient reason to believe the phone contained evidence of drug trafficking until after he began to view the image gallery.

trafficking,[4] the information relating to drug trafficking from the call still cannot be the basis for the search warrant because on this record we cannot determine whether answering the phone call, and the information obtained from it, were "genuinely independent" from the unlawful warrantless search of the image gallery.[5]

¶ 62. The sequence in which law enforcement obtained evidence and information is important in the present case. On December 6, law enforcement first lawfully obtained Carroll's cell phone with the "mari-

---

[5] "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

The "independent source" and "attenuation" doctrines may avoid the suppression of evidence even though a Fourth Amendment violation has taken place.

> The Supreme Court has recognized two exclusionary rule exceptions that are based upon the circumstances surrounding the unconstitutional discovery of the evidence. The "independent source" exception allows the government to use illegally obtained evidence if the government also discovered the evidence by means independent of its misconduct. The attenuation exception, in contrast, permits the use of evidence discovered through the government's misconduct if the connection between the misconduct and the discovery of the evidence is sufficiently weak.

Brent D. Stratton, *The Attenuation Exception to the Exclusionary Rule: A Study in Attenuated Principle and Dissipated Logic,* 75 J. Crim. L. & Criminology 139, 140–41 (1984).

The doctrine of "attenuation" applies a totality of the circumstances analysis but has evolved to apply a three-factor test: (1) the temporal proximity between the Fourth Amendment violation and the subsequent basis for acquiring the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of any official misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

juana image" in plain view. Lawful search and seizure! The Detective then almost immediately viewed the "image gallery" photos on the cell phone. Majority op., ¶ 8. Unlawful search! The question then is what is the time sequence of viewing the "image gallery" and the Detective's answering the phone, after not answering several other calls. *See* majority op., ¶¶ 8, 9, 33.

¶ 63. Except for the Detective's affidavit in support of the search warrant, nothing in the circuit court record refers to the Detective's answering the cell phone. Although the majority now relies on this phone call evidence, at the circuit court it simply was not discussed. Therefore the record does not demonstrate precisely when the Detective answered the call. What is clear from the record, however, is that the Detective examined the "image gallery" in the squad car almost immediately after he recovered the phone and placed Carroll in the squad car. Majority op., ¶ 8. The time of the phone call is unknown but appears to be after the Detective viewed the "image gallery." According to the State's brief, "the cell phone call necessarily came in within four hours after the detective had seized the cell phone."

---

[4] Carroll argues that the "marijuana image"—that is, the image of Carroll smoking a "blunt"—at most raises a reasonable suspicion that he was smoking marijuana, not probable cause to believe that he was selling drugs.

The Detective also stated in his affidavit, as part of the litany of his experience, that drug dealers personalize their cell phones with photos. It is not clear, however, from the Detective's affidavit that the "marijuana image" constituted the relevant "personalizing" of the phone, when the officer made no reference to this image. It is at least as likely that it was the "image gallery," whose contents the Detective detailed, that constituted the relevant "personalizing" of the phone.

¶ 64. Two days later, the Detective sought a warrant to obtain the "image galley" photos, the very same evidence he had already viewed unlawfully.[6] The affidavit in support of the application for a search warrant did not even mention the critical evidence on which the majority relies, namely the "marijuana image," which law enforcement had lawfully obtained. The affidavit relied on the information law enforcement obtained from the phone call, on the unlawful examination of the "image gallery," on Carroll's juvenile record and 2004 criminal complaint, and on the Detective's experience with drug trafficking.

¶ 65. The affidavit for the warrant to search the cell phone includes a section titled "Basis for the Request for the Search Warrant," which details that as a result of Detective Belsha's training, experience, and discussions with other experienced law enforcement officers, he is familiar with the methods of distribution and communication devises used by drug traffickers (listed in ¶¶ 1(b) through 1(k)), including "(i) Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs and photographs are often kept in their residences and/or places of business; and *personalize cellular telephones* with such information" (emphasis added). This statement in the affidavit is the only reference to personalizing cell phones.

¶ 66. The affidavit then lists (in ¶¶ 3(a) through 3(e)) matters relating specifically to Carroll to justify

---

[6] Part of the information obtained pursuant to the warrant was the "metadata" embedded in the digital photo files that indicates the time and date when the photos were taken. There is no indication that the Detective obtained this more detailed information prior to receiving the search warrant.

the issuance of a search warrant: 3(a) a 2004 criminal complaint in which Carroll was observed to be involved in drug trafficking; 3(b) the details of the traffic stop; 3(c) a search of the cell phone that revealed images of Carroll with a firearm; 3(d) a juvenile court record showing that Carroll was adjudicated delinquent of a felony offense, possession with intent to deliver cocaine; and 3(e) an incoming call on Carroll's cell phone from someone seeking to buy drugs and an examination of the phone "incident to Carroll's arrest" that revealed numerous photographs of Carroll with a firearm and "photos of Carroll with what appears to be a quantity of marijuana, photos of what appears to be cocaine, as well as a photo of drugs, money, and a revolver."

¶ 67. To determine whether the warrant issued on this basis was "genuinely independent" of the earlier tainted "image gallery" evidence, I apply the teachings of *Murray v. United States,* 487 U.S. 533 (1988), and *State v. Lange,* 158 Wis. 2d 609, 626, 463 N.W.2d 390 (Ct. App. 1990).[7] According to Murray, the State has the burden of "convincing a trial court that no information

[7] For an excellent discussion of the numerous cases involving a search as the fruit of a prior illegal search, including the *Murray* case, 487 U.S. 533 (1988), see 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(f) (4th ed. 2004).

The majority opinion applies an "independent source" analysis, not an attenuation analysis. Neither the State nor the majority opinion has attempted to argue that the alternative basis for admitting the evidence derived from interception of the call to the cell phone is "attenuated" from the unlawful search of the image gallery or that its taint has been "dissipated." If such analysis were made, it would plainly fail: the call was intercepted *at the same time* that the illegal search was taking place, in immediate connection with the images being viewed, and without an intervening event. The connection

gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray,* 487 U.S. at 540, quoted at majority op., ¶ 45. *See also Lange,* 158 Wis. 2d at 626.[8]

¶ 68. Adhering to *Murray* and *Lange,*[9] I would remand the cause to the circuit court for a factual determination (1) whether any information gained from the phone call or the illegal search of the image gallery affected the law enforcement officers' decision to seek a warrant; and (2) whether any information gained from the phone call or the illegal search of the image gallery affected the magistrate's decision to grant the application. *See* majority op., ¶ 45. The burden of proving that the evidence is lawfully obtained is on the state. Majority op., ¶ 19.

¶ 69. I reach this conclusion first by examining the facts and holding of *Murray.* In *Murray,* the federal agents had investigated the criminal activity and had obtained sufficient evidence to show probable cause

---

between the two occurrences was direct. *See Brown v. Illinois,* 422 U.S. 590, 603–04 (1975), discussed *supra* n.5.

 [8] In *State v. Lange,* 158 Wis. 2d 609, 463 N.W.2d 390 (Ct. App. 1990), the warrant application relied on aerial and open field observations acquired legally *before* investigators made an illegal entry into defendant's marijuana field. Only the last piece of evidence on which the warrant relied was impermissible, yet the court of appeals, following *Murray,* remanded the cause for the factual determination of whether the warrant application would have been made even without that last piece of the evidence.

 [9] *State v. Herrmann,* 2000 WI App 38, 233 Wis. 2d 135, 608 N.W.2d 406, on which the majority relies, is not, in my opinion, relevant to this case. As the majority acknowledges, *Herrmann* did not apply the *Murray* framework on which the majority opinion depends.

341

that the accused were engaged in an extensive drug trafficking conspiracy. None of this evidence violated the Fourth Amendment. Only this untainted evidence was presented on the application for a search warrant.

¶ 70. The problem in *Murray* was that after legally obtaining this evidence, the federal agents illegally entered a warehouse without a warrant and observed numerous bales of marijuana inside. *Murray,* 487 U.S. at 536. The agents exited the warehouse without disturbing the evidence. Then the agents applied for a warrant.

¶ 71. In the warrant application for a search of the warehouse in *Murray,* the federal agents made no mention whatsoever of the illegal search or of the observations made inside the warehouse. The search warrant was issued *only* on the basis of lawfully obtained evidence obtained prior to the illegal entry. *Murray,* 487 U.S. at 535–36. The district court denied the defendants' suppression motion and the Court of Appeals affirmed. *Murray,* 487 U.S. at 536.

¶ 72. The *Murray* Supreme Court[10] reversed and remanded to the district court. Although the federal court of appeals had observed that "this is as clear a case as can be imagined where the [evidence illegally observed] . . . was totally irrelevant" to the issuance of the warrant, 487 U.S. at 543, the Supreme Court was not convinced that the information in the warrant was genuinely independent of the illegal search of the warehouse. The Supreme Court was concerned that the agents' decision to seek the warrant was prompted by what they had seen during the unlawful entry into the warehouse. The Supreme Court also was concerned

[10] *Murray* was decided 4–3, with Justices Brennan and Kennedy not participating. 487 U.S. at 544.

that if the information obtained during that unlawful entry had been presented to the magistrate, the unlawfully obtained information might have affected his decision to issue the warrant. *Murray,* 487 U.S. at 542.

¶ 73. The Supreme Court remanded the cause to the district court because the district court had "not . . . explicitly [found] that the agents would have sought a warrant if they had not earlier entered the warehouse."[11]

¶ 74. In contrast to the remand for explicit factual findings required both in *Murray* and in *Lange,* here the majority opinion finds a "clear inference" that Detective Belsha "would have sought" the warrant, even without the tainted evidence. Majority op., ¶ 51. The inference seems to be based on the court's post hoc legal rationalization that because Detective Belsha "could have" been granted a warrant on the basis of untainted evidence, he surely would have sought a warrant, which surely would have been granted. The inference is unsupported by law or by the record.

¶ 75. As the Wisconsin court of appeals observed in *Lange,* 158 Wis. 2d at 627, "we do not make factual findings." *Murray* simply does not contemplate that, in the absence of any relevant fact-finding by a trial court, an appellate court can reach its own "inference" about whether the law enforcement officers sought the warrant on the basis of evidence that is genuinely independent of the unlawfully obtained evidence.

¶ 76. Justice Scalia's opinion in *Murray* demands a record from which the inference is "clear enough to justify the conclusion that the District Court's findings

---

[11] *Murray,* 487 U.S. at 543.

amounted to a determination of independent source."[12] And the facts in *Murray* provided a much stronger justification for an inference of "genuine independence" than in the present case.

¶ 77. In *Murray*, the only evidence set forth in the application for the warrant was evidence lawfully obtained *before* the agents unlawfully obtained additional evidence that was then omitted from the warrant application. In *Murray*, the district court and court of appeals refused to suppress the evidence. In contrast, in the present case the circuit court suppressed the evidence. If any inference could be drawn from the circuit court's record in the present case, it must be that the evidence from the phone call was tainted.

¶ 78. The record in this case falls short of providing the bases for determining (1) whether any information gained from the phone call or the illegal search of the image gallery affected the law enforcement officers' decision to seek a warrant; and (2) whether any information gained from the phone call or the illegal search of the image gallery affected the magistrate's decision to grant the application. What is plainly required, and not present in this record, is for the State to establish as a matter of fact—not as a matter of speculation—that the

---

[12] *Id.* The only instance in the *Murray* opinion in which Justice Scalia discussed an inference is as follows:

> To be sure, the District Court did determine that the purpose of the warrantless entry was in part "to guard against the destruction of possibly critical evidence," and one could perhaps infer from this that the agents who made the entry already planned to obtain that "critical evidence" through a warrant-authorized search. That inference is not, however, clear enough to justify the conclusion that the District Court's findings amounted to a determination of independent source.

*Murray*, 487 U.S. at 543.

unlawfully obtained "image gallery" evidence affected neither "the decision to seek the warrant," nor the "decision to issue the warrant." *Murray,* 487 U.S. at 542.

¶ 79. The majority opinion reaches a conclusion of law—whether the affidavit stripped of the unlawful "gallery images" is genuinely independent of the unlawfully obtained evidence—by impermissibly making a factual inference about the Detective's decision to seek the warrant and the magistrate's decision to issue it.

¶ 80. The majority opinion's logic permits an officer who has already obtained sufficient evidence for a search warrant to proceed nevertheless without one, confirming that the suspected evidence actually exists and thus avoiding the need to apply for a warrant until the suspicions have already been confirmed. In my opinion, the majority ignores the underlying deterrence rationale of the exclusionary rule. The exclusionary rule "is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). This court should not support a " 'search first, warrant later' mentality,"[13] and should not fabricate a "post hoc justification for using information that had already been illegally obtained."[14]

---

[13] *Murray,* 487 U.S. at 540 n.2.

[14] *United States v. Taheri,* 648 F.2d 598, 600 (9th Cir. 1981). Where police first impermissibly opened a package and seized drugs to perform a chemical drug test, then used a drug-sniffing dog to alert on the package and afterwards sought a warrant only on the basis of the dog's alert, the court reasoned that

[t]he government's position cannot be reconciled with the policy behind the exclusionary rule: the effective deterrence of unlawful searches and seizures. . . . [Such argument would be] no more than a post hoc justification for using information that had already been

¶ 81. For the reasons set forth, I dissent.

¶ 82. DAVID T. PROSSER, J. (*dissenting*). The issue in this case is whether a cell phone photo of the defendant holding a semi-automatic weapon, and other cell phone photos depicting firearms, should be suppressed as evidence. There is no dispute that the defendant had been adjudicated delinquent as a juvenile for a drug-related felony. There is also no dispute that the defendant unlawfully possessed a firearm after his felony adjudication. The question here is whether law enforcement obtained evidence of this crime in conformity with the Fourth Amendment. Because I have serious reservations about police procedure in obtaining the pivotal evidence, I respectfully dissent.

I

¶ 83. The facts are as follows. On Wednesday, December 6, 2006, a Milwaukee police detective and an FBI special agent were conducting surveillance of a house in the area of 21st and West Brown Streets in the City of Milwaukee. It was approximately 8 p.m. The law enforcement officers were investigating an armed robbery and, in that connection, they were monitoring a vehicle near the house. The suspect vehicle was a white Ford Escort. Although the house in question may have been the house occupied by the defendant's aunt, there

---

illegally obtained. To permit evidence to be admitted under these circumstances would encourage police officers to ignore the dictates of the fourth amendment in conducting initial investigations. . . . [M]echanical application of the traditional *Wong Sun* "independent source" analysis where a search warrant is subsequently commissioned albeit supported by an affidavit that relies upon independent evidence, would allow police officers to treat the warrant requirement as merely an ex post facto formality.

*Id.* (internal citations omitted).

is no evidence in the record that either the defendant or the defendant's aunt has ever been charged in connection with a robbery or with the receipt of stolen property from a robbery.

¶ 84. The white Ford Escort "left the location" of 21st and Brown Streets, driving south on 21st to Vine Street, then west on Vine to 24th Street, then south on 24th to Lisbon Avenue, then west on Lisbon to 27th Street, where it turned into a gas station on the northeast corner of 27th and Lisbon.

¶ 85. Detective John Belsha of the Milwaukee Police Department testified that the Ford Escort drove slowly by his vehicle on 21st Street, then quickly speeded up. The officers gave chase. The Ford consistently exceeded the speed limit, traveling as fast as 60 miles per hour on Lisbon Avenue, with the officers in hot pursuit. The record does not indicate whether the officers were in a marked squad car or flashed their overhead lights as they pursued the defendant's car.

¶ 86. At the gas station, the defendant "exited the driver's seat very quickly . . . . He had something in his hand," so that Detective Belsha drew his service weapon and ordered the defendant "to drop what was in his hand and get down on the ground."

¶ 87. The defendant dropped the object, which turned out to be a U.S. Cellular Audiovox cell phone. The cell phone was a "flip phone with a camera on the front. It [had] a clock on it, a little display with a clock on it."

¶ 88. Detective Belsha later testified that when the defendant dropped the phone, it was either open or flipped open when it hit the ground. The detective, who did not know defendant Carroll, handcuffed him, briefly examined his cell phone, then asked him to identify himself. The defendant gave his name but did

347

not have identification with him. After the defendant gave his name, the officers ran "a routine wanted check" on him and "it came up with a suspended status for driver's license."

¶ 89. When Detective Belsha picked up the cell phone, he noticed on the display screen a picture of the defendant "smoking what's commonly referred to as a blunt, a marijuana cigarette."

¶ 90. The defendant was taken into custody and placed in the back of the police vehicle. Detective Belsha sat in the front seat of the vehicle and activated a photo gallery in the phone. At that point he observed pictures of illegal drugs, a large amount of currency, and fire-arms, including a picture of the defendant holding a semi-automatic weapon. He also encountered a picture of the defendant holding what appeared to be a gallon size baggie of marijuana in his teeth.

¶ 91. While Detective Belsha was in his vehicle, the defendant's cell phone rang more than once. On one occasion, the detective answered the phone and heard what he interpreted as a request to buy cocaine. The caller asked for "4 of those things; 4 and a split."

II

¶ 92. A suppression hearing on the firearm photos was held in two sessions, on March 9 and March 23, 2007, before Milwaukee County Circuit Judge Charles F. Kahn, Jr. At the second session, Judge Kahn exam-ined the defendant's cell phone, which had been re-trieved from the police department property room, and he described the phone for the record. He then stated the issue as whether Detective Belsha had the legal authority, after viewing the cell phone display picture of

348

the defendant smoking a blunt, "to go further and look at the other pictures electronically saved in the cell phone itself."

¶ 93. The State argued that "a further search of the phone was justified incident to the arrest of the defendant." Carroll's arrest, it said, was based not only on driving (e.g., speeding and suspended license) but also on "the observations of the officer in terms of the contents of the phone."

¶ 94. The defendant asserted that Detective Belsha's activation of the cell phone menu to expose pictures in the photo gallery was "a search for evidence, not an inventory search," and thus required a search warrant.

¶ 95. Judge Kahn concluded that the cell phone posed no danger to officers and that "because there was no arrest made until after the search of the cell phone, the private information on the cell phone ... which formed the basis for [a subsequent] search warrant [for the phone] was obtained illegally" and could not properly be considered by the court commissioner reviewing the affidavit for the search warrant.

¶ 96. It should be noted that the search warrant and the affidavit supporting it were part of the record at the suppression hearing. The affidavit makes reference to Detective Belsha's interception of the phone call after reviewing the pictures in the photo gallery. There was, however, no testimony about this interception at the suppression hearing, and the State did not refer to the interception in its argument at the suppression hearing.

¶ 97. Judge Kahn identified the nub of this dispute when he asked whether Detective Belsha could rely on a single cell phone photo of the defendant smoking a blunt, and the other known circumstances at

the time, as justification to search the photo gallery within the phone without obtaining a warrant. A related question is whether the single cell phone photo of the 19–year-old defendant smoking a blunt, together with other known circumstances, was sufficient to give the detective authority to begin answering the defendant's cell phone calls.

¶ 98. In short, did the totality of the evidence *available at the gas station* give the police probable cause to search the defendant's cell phone for photos and intercept his calls without first obtaining a search warrant?

¶ 99. The majority concludes that searching the cell phone photo gallery on this evidence was unlawful, and I agree. But the majority then goes on to conclude that the single display photo of the defendant smoking a blunt was enough to permit police interception of defendant's calls to avoid the destruction of drug evidence. This analysis was not argued to the trial court, nor considered by the trial court. It is inconsistent with this court's ruling on the photo gallery and, in my view, at odds with the privacy of citizens.

### III

¶ 100. The defendant had a U.S. Cellular Audiovox cell phone. When this phone is flipped open, it reveals a liquid crystal display (LCD) screen at the top and a keypad to activate the multiple functions of the phone at the bottom. Normally, a flip-type phone is not open unless it is being used. Consequently, the photo of the defendant smoking a blunt would normally not be in plain view, as it was to Detective Belsha. The defendant makes no claim that the detective flipped the phone open to see the photo on the LCD screen.

¶ 101. At the same time, the defendant's photo on the LCD screen—a photo of critical significance in the majority opinion—is never mentioned in the detective's six-page police report. It is not mentioned in the affidavit supporting the application for a search warrant. It is not mentioned in the criminal complaint. And it is not mentioned in the transcript of the preliminary hearing. There is no reference to the blunt photo in the record until the State filed its response to the motion to suppress. I find it curious that the majority attributes such significance to a cell phone photo that this court has never seen and that the key officer in this case did not highlight until three months after the defendant's arrest.

¶ 102. At the suppression hearing, the State took the position that the officer could examine the contents of the cell phone—i.e., conduct a search of the phone—incident to the defendant's arrest. The circuit court found, however, that while the defendant was in custody when he was placed in the back of the police car, he was not under arrest until after the officer's search of the phone. In any event, the majority concludes that activating the photo menu was not lawful when the activation was based principally on the blunt photo.

IV

¶ 103. Detective Belsha's affidavit in support of a search warrant for the cell phone reads in part:

> [A]n examination of said phone incident to the arrest of Jermichael Carroll revealed numerous photographs, several of the photos including firearms. Jermichael Carroll is in possession of a firearm in one of the photographs, with a separate photo of only the same firearm in another photo. Your affiant states that based

upon your affiant[']s training and experience, and the examination of the photo, it appears to your affiant to be an actual semi-automatic firearm. Additionally, there are photos of Carroll with what appears to be a quantity of marijuana, photos of what appears to be cocaine, as well as a photo of drugs, money, and a revolver.

¶ 104. According to the majority opinion, none of these statements should have been included in the affidavit. The only statement about photo evidence that the detective was entitled to cite in the affidavit was that he observed a photo of Jermichael Carroll smoking a marijuana cigarette, in plain view on the display screen of Carroll's cell phone. But such a statement was *not* included in the affidavit.

¶ 105. Of course, Detective Belsha did offer additional information in the affidavit. He said that while he possessed the defendant's cell phone,

said phone continued to ring; your affiant answered one of the calls made to said phone on December 6, 2006 and pretended to be Jermichael Carroll. Your affiant states that the caller asked your affiant for "4 of those things; 4 and a split," which based upon your affiant's training and experience in investigations related to the distribution of controlled substances is a slang, requesting the purchase of a 4 1/2 ounce quantity of cocaine, consistent with drug trafficking.

¶ 106. This evidence is quite compelling. If an affidavit for a warrant to search a person's cell phone were to assert that the person has been adjudicated delinquent for possession with intent to deliver cocaine (a felony), that the person's cell phone features a picture of the person smoking a marijuana cigarette, and that the affiant intercepted a call to the person's cell phone from a probable cocaine purchaser, the affidavit would

contain probable cause to search the person's cell phone. The critical question is whether Detective Belsha was entitled to intercept the call to the defendant's cell phone and then use the resulting information in his affidavit.

¶ 107. It is quite clear from the testimony that Detective Belsha did not answer the defendant's phone and impersonate the defendant until after he had examined all the pictures inside the phone. The photos provided grounds to answer the defendant's phone, but the detective could not lawfully examine those photos without a warrant.

¶ 108. Thus, the question is whether Detective Belsha was entitled to intercept the defendant's phone call on only the following information:

(1) An unknown person turned up in the location of a house under surveillance in connection with a robbery.

(2) The person was speeding after he left the area of surveillance, possibly trying to evade a car that he may or may not have known was a police car.

(3) The person's license to drive was suspended.

(4) The person's cell phone showed a picture of him smoking a marijuana cigarette.

(5) Drug traffickers frequently take, or cause to have taken, photographs of themselves with illegal drugs and then personalize their cell phones with those pictures.

¶ 109. The syllogism that the majority appears to rely on is as follows:

(1) Drug traffickers frequently personalize their cell phones with pictures of themselves possessing illegal drugs.

(2) The defendant's cell phone shows him smoking a marijuana cigarette.

(3) Therefore, the defendant is probably a drug trafficker.

¶ 110. Then the majority adds that because the defendant is probably a drug trafficker, the police are entitled to intercept his telephone calls without a warrant so that they will not lose evidence of drug dealing.

¶ 111. To my mind, this analysis does not hold up or justify a search by warrantless interception of the defendant's phone calls. The facts here do not establish exigent circumstances permitting the police to dispense with a warrant.

¶ 112. The officers did not know who Carroll was and did not know of his felony adjudication at the time Detective Belsha intercepted the call. Carroll did post a picture of himself smoking marijuana on his phone, but he could have been an occasional marijuana user instead of a drug trafficker. The internet features many pictures of marijuana that people can employ as "wallpaper" on their cell phone display screens. After this decision, will an impersonal picture of illegal drugs on a cell phone provide probable cause for a search of the phone without a warrant?

¶ 113. There is no evidence in the record that Carroll has been charged with any offense other than being a felon in possession of a firearm. Thus, the drug pictures did not lead to additional drug evidence or drug-related charges.

¶ 114. Law enforcement may have been able to obtain a search warrant without reliance on the photos in the photo gallery or reference to the intercepted telephone call. If not, they should not have been able to intercept the phone call without a warrant.

¶ 115. This case is different from *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007). Finley was the driver of a drug seller's vehicle during a controlled drug

buy. *Id.* at 253. The authorities had evidence that he was a drug user as well as a participant in an illegal drug transaction at the time they searched his cell phone without a warrant. *Id.* at 254–55. In *United States v. De La Paz,* 43 F. Supp. 2d 370 (S.D.N.Y. 1999), the defendant was arrested following a three-month investigation into alleged drug dealing activities. A federal agent answered the defendant's cell phone as he was being booked. These cases are different from this case, where the only evidence of Carroll's personal involvement with drugs at the time his call was intercepted was his cell phone photo smoking a blunt. Consequently, one does not have to disagree with either *Finley* or *De La Paz* to distinguish them from this case. I note that the Ohio Supreme Court recently took a restrictive view of warrantless cell phone searches. *See State v. Smith,* No. 2008–1781, 2009 WL 4826991 (Ohio, Dec. 15, 2009) (citing *United States v. Park,* No. CR 05–375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007)).

V

¶ 116. Detective Belsha's affidavit to support the search warrant is problematic for several reasons. First, it should not have contained discussion of the pictures in the photo gallery. Second, in my view, it should not have relied upon the intercepted phone call. Third, it did *not* refer to the blunt photo on the display screen. Fourth, the affidavit is very heavy in boilerplate paragraphs that have nothing to do with the search of a cell phone. Fifth, the affidavit seriously misleads the reader when it says: "A search of the Carroll [sic] revealed a cellular telephone." This passage immediately follows a discussion of the Carroll vehicle and mistakenly implies that the cell phone was taken from the Carroll vehicle. Sixth, the affidavit states: "Your affiant attaches and

355

incorporates into this affidavit a criminal complaint dated May 22, 2006 in which the target . . . was observed to be involved in activity consistent with drug trafficking." The affidavit fails to acknowledge that this complaint was dismissed before the affidavit was filed and that the complaint involved guns, not "drug trafficking." The unspoken implication is that a person is acting "consistent with drug trafficking" if the person possesses a gun.

¶ 117. For all these reasons, the photos of the defendant with a firearm should be suppressed, or, at a minimum, this case should be remanded to the circuit court for a hearing to determine whether the information gathered from illegal searches and other misleading information in the affidavit improperly tainted the court commissioner's decision to issue the warrant. *See Murray v. United States*, 487 U.S. 533 (1988).

¶ 118. For the reasons stated, I respectfully dissent.